## HENLEY *v.* STATE.

(*Jackson.* May 29, 1897.)

1. CONSTITUTIONAL LAW. *Wisdom and policy of legislation.*

   The Legislature, not the Courts, determines and is alone responsible for the wisdom, propriety, desirability, and policy of statutes. These matters are committed to the intelligence, patriotism, and discretion of the representatives of the people, and the Courts will not run a race of opinions with these representatives upon the question of the wisdom, propriety, or expediency of their action. (*Post, pp. 679–681.*)

   Cases cited and approved: McGinnis *v.* State, 9 Hum., 47; Washington *v.* Mayor, etc., 1 Swan, 180; Davis *v.* State, 3 Lea, 378; Ballentine *v.* Pulaski, 15 Lea, 634; Lynn *v.* Polk, 8 Lea, 229; Peck *v.* State, 86 Tenn., 262; Williams *v.* Nashville, 89 Tenn., 488; Cole Mfg. Co. *v.* Falls, 90 Tenn., 481; Sutton *v.* State, 96 Tenn., 698.

2. SAME. *Extent and limits of legislative power.*

   The Legislature has unlimited power to act in its own sphere of legislation, except so far as restrained by the Constitution of the United States and the Constitution of the State. (*Post, p. 681.*)

   Cases cited and approved: Bell *v.* Bank, Peck, 269; Hope *v.* Deaderick, 8 Hum., 8; Davis *v.* State, 3 Lea, 377; Stratton *v.* Morris, 89 Tenn., 497.

3. SAME. *Statute valid unless it violates some provision of the Constitution.*

   A statute which does not violate some provision of the Constitution cannot be annulled by the Courts, whether its provisions are wise or unwise, or whether its operation be hurtful or beneficial. (*Post, p. 681.*)

4. SAME. *Same.*

   It is settled law that he who insists upon the unconstitutionality of a statute, must point out the specific provision of the Constitution which it expressly, or by unavoidable implication,

violates. It cannot be annulled upon supposed natural equity, the inherent rights of freemen, or upon any general or vague interpretation of a provision of the Constitution beyond its plain and obvious import, or as being opposed to a spirit supposed to pervade the Constitution, but not expressed in words, or as being contrary to the genius of a free people. (*Post, pp. 681–683.*)

Cases cited and approved: Davis *v.* State, 3 Lea, 377; Stratton *v.* Morris, 89 Tenn., 497; Bell *v.* Bank, Peck, 269: Hope *v.* Deaderick, 8 Hum., 8; Demoville *v.* Davidson County, 87 Tenn., 220; Reelfoot Lake *v.* Dawson, 97 Tenn., 159; Luehrman *v.* Tax. Dist., 2 Lea, 438.

5. SAME. *Rules for construing statutes.*

Courts do not exercise arbitrary powers in construing either statutes or constitutions. The Courts give to statutes upon trial for their constitutionality, the benefit of every reasonable doubt, indulge every reasonable intendment in their favor, and adopt that construction, in cases of doubt, which will sustain the validity of the law. (*Post, pp. 681, 682.*)

Cases cited and approved: Morrell *v.* Fickle, 3 Lea, 81; Garvin *v.* State, 13 Lea, 162; State *v.* Yardley, 95 Tenn., 550; Cole Mfg. Co. *v.* Falls, 90 Tenn., 466; Ellis *v.* State, 92 Tenn., 93; Horne *v.* Railroad, 1 Cold., 74; Railroads *v.* Crider, 91 Tenn., 506.

6. SAME. *The "Jarvis bill" does not take "particular services" of the citizen.*

The "Jarvis bill," in forbidding the payment out of the State or county treasuries of compensation to officers and witnesses, for such services as they have ordinarily been required to tender on behalf of the State in the administration of the criminal laws, does not deprive them of such "particular services" as the Constitution forbids to be taken from the citizen for public use without compensation. (*Post, pp. 683–697.*)

Constitution construed: Article I., Sec. 21.

Acts construed: Acts 1897, Ch. 20.

7. SAME. *"Particular services" defined.*

"Particular services," within the meaning of the constitutional provision that no man's particular services shall be demanded without the consent of his representatives or just compensation, means peculiar services, limited services—not ordinary or general services. Ordinary services, such as may be required

of all citizens or officials by general or valid special laws, are not particular services. (*Post, p. 684.*)

Constitution construed: Article I., Sec. 21.

Cases cited and approved: Washington v. Nashville, 1 Swan, 180; Wright v. State, 3 Heis., 256; House v. White, 5 Bax., 692; Neely v. State, 4 Bax., 174; Avery v. State, 7 Bax., 331; Taylor v. Chandler, 9 Heis., 360; 8 Ind., 467; 59 Ind., 12, 18; 14 Ore., 20.

8. SAME. *Jarvis bill infringes no vested common law right.*

The Jarvis bill infringes no vested right of the citizen. The right to costs did not exist at common law, and is the creature of statute. The liability of State and counties for costs is purely of statutory creation. Statutes creating such liability are construed with great strictness. They may be amended or repealed at pleasure. The constitutional provisions forbidding suit against the State without its consent, and forbidding the use of public funds without appropriations made by law, make affirmative legislative action necessary to the payment of costs out of the public treasury. (*Post, pp. 688–695.*)

Constitution construed: Article I., Sec. 17; Art. II., Sec. 24.

Cases cited and approved: Mooneys v. State, 2 Yer., 578; Morgan v. Pickard, 86 Tenn., 208; State v. Odom, 93 Tenn., 446; State v. Barton, 3 Hum., 13; Prince v. State, 7 Hum., 137; Tucker v. State, 2 Head, 556; Lynn v. Polk, 8 Lea, 121; Watson v. Bank, 3 Bax., 395; State v. Sneed, 9 Bax., 479; Stout v. State, 91 Tenn., 405; Shelton v. State, 96 Tenn., 521; Avery v. State, 7 Bax., 331.

9. SAME. *When statute is "the law of the land."*

A statute is "the law of the land," which embraces all persons who are already or who may thereafter come into similar situations, conditions, and circumstances. If classifications are resorted to, they must be natural and reasonable, not arbitrary and capricious. (*Post, pp. 698–701.*)

Cases cited and approved: Mayor v. Dearmon, 2 Sneed, 104; State v. Rancher, 1 Lea, 97; Davis v. State, 3 Lea, 367; Maney v. State, 6 Lea, 221; Hatcher v. State, 12 Lea, 371; Woodard v. Brien, 14 Lea, 523; Stratton v. Morris, 89 Tenn., 499; Bank v. Cooper, 2 Yer., 600; State v. Staten, 6 Cold., 233; Knox v. State, 9 Bax., 202; Dugger v. Insurance Co., 95 Tenn., 245; Sutton v. State, 96 Tenn., 696.

10. SAME. *Same. Jarvis bill.*

The Court will not review the discretion of the Legislature in appropriating or refusing to appropriate public funds for the

Henley v. State.

purposes of government, upon the ground that its classifications of the objects provided for or denied appropriations are not natural and reasonable, but arbitrary and capricious. (*Post, pp. 698, 699*.)

Acts construed: Acts 1897; Ch. 20.

11. SAME.    *Same.    Same.*

The classifications of the " Jarvis bill," both in providing for payment of costs in certain cases and refusing costs in other cases, and in compensating witnesses in certain instances and refusing compensation in other instances, are not arbitrary and capricious, but natural and reasonable when viewed in the light of former legislation and the circumstances confronting the Legislature. (*Post, pp. 698–701*.)

Acts construed: Acts 1897, Ch. 20.

12. SAME.    *Fair and impartial trial.*

There is no constitutional guarantee, express or implied, that secures to persons put on trial for crime the services of impartial Sheriffs, impartial Clerks, or impartial witnesses. The requirement of impartiality is confined to the jury. (*Post, pp. 701–703*.)

13. SAME.    *Same.    Jarvis bill.*

The provisions of the Jarvis bill making the payment, by the State or counties, of costs and fees of officers and witnesses in criminal cases dependent upon conviction, does not deprive the accused of the benefit of any constitutional guarantees relating to the trial of criminal cases.    The fees of the jurors, and of the Sheriff for summoning the jury, are excepted, and not left to depend on conviction.    The Clerk is a mere amanuensis of the Court to enter its orders.    The Justice is remotely interested, and has no direct connection with the trial.    The interest of witnesses goes to their credit. (*Post, pp. 704–706*.)

Constitution construed: Art. I., Sec. 6.

Act construed: Acts 1897, Ch. 20.

Cases cited and approved: Grundy County v. Tenn., etc., Co., 94 Tenn., 295; Clapp v. State, 94 Tenn., 186; Eason v. State, 6 Bax., 475; McGinnis v. State, 9 Hum., 47; Trigally v. Memphis, 6 Cold., 382; Hogan v. Chattanooga, 2 Leg. Rep., 12; Yardley case, 95 Tenn., 563; Railroads v. Crider, 91 Tenn., 489.

Henley *v.* State.

14. SAME.  *Repeals by implication.*

Reference to laws repealed is not necessary in an original stat-
ute which repeals them only by necessary implication.  (*Post*,
*pp. 707, 708.*)

Constitution construed: Article II., Sec. 17.

Act construed: Acts 1897, Ch. 20.

Cases cited and approved: Home Ins. Co. *v.* Taxing Dist., 4 Lea,
650; Maney *v.* State, 6 Lea, 218; Railroads *v.* Crider, 91 Tenn.,
506; Knoxville *v.* Lewis, 12 Lea, 181; State *v.* Yardley, 95
Tenn., 546; Ballentine *v.* Pulaski, 15 Lea, 633; Poe *v.* State, 85
Tenn., 495; Hunter *v.* Memphis, 93 Tenn., 571.

FROM SHELBY.

Appeal in error from Criminal Court of Shelby
County.  L. P. COOPER, J.

C. R. BARTEAU, J. J. LYNCH, P. TURNEY, GEO.
B. PETERS, JNO. J. VERTREES for Henley.

Attorney-general PICKLE, E. JARVIS, and JAMES
M. GREER for State.

WILKES, J.  The question involved in this case
is the validity and constitutionality of the Act of
the General Assembly of Tennessee passed February
3, 1897, commonly known as the Jarvis law.

The contest arises upon motions made in the
Criminal Court of Shelby County to tax against the
State certain costs, which motions were allowed, and
the costs taxed upon the ground that the Act re-

ferred to is unconstitutional and void. The State
has appealed. The Act in question is in the words
and figures following :

"AN ACT to regulate and restrict the payment of costs and
fees in criminal prosecutions.

"SECTION 1. *Be it enacted by the General As-
sembly of the State of Tennessee*, That neither the
State of Tennessee, nor any county thereof, shall
pay or be liable in any criminal prosecution for any
costs or fees hereafter accruing, except in the fol-
lowing classes of cases :

"(1) Cases of homicide, rape, robbery, burglary,
arson, embezzlement, incest or bigamy, when the
prosecution has proceeded to a verdict in the Circuit
or Criminal Court ;

"(2) Cases under the small offense law, where
the defendant has submitted before a Justice of the
Peace and been sent to the workhouse ; and,

"(3) All cases where the defendant has been con-
victed in a court of record and the execution issued
upon the judgment against the defendant has been
returned *nulla bona ;*

"*Provided*, That neither the State of Tennessee,
nor any county thereof, shall be liable for, or pay
any costs in any criminal case where security has
been accepted by the officer taking the security, and
an execution afterward returned *nulla bona* as to the
defendant and his securities ;

"*Provided*, That the compensation for boarding

prisoners, expenses of keeping and boarding juries, compensation of jurors, costs of transcripts in cases taken to the Supreme Court by appeal or writ of error, mileage and legal fees for receiving or conveying criminals and prisoners from one county to another, or from one jail to another, and compensation and mileage of witnesses for the State duly subpœnaed and required to attend before any Court, grand jury, or Magistrate in a county other than that of their residences, and more than five miles from such residence, and where any witness for the State shall be confined in jail to await the trial in which he is to testify, shall be paid in all cases as heretofore.

"SEC. 2. *Be it further enacted*, That neither the State of Tennessee nor any county thereof shall pay or be liable in any criminal case or prosecution for the fees, costs, or mileage which may hereafter accrue in favor of any witness who shall, at the time of his attendance as such witness before any Court, grand jury, or Magistrate, reside within five miles of the place where he attends as such witness.

"SEC. 3. *Be it further enacted*, That this Act take effect from and after its passage, the public welfare requiring it.

"Passed February 2, 1897."

After the passage of this Act, and while it was in force, on the seventeenth of March, 1897, John Henley and others were indicted in the Criminal Court of Shelby County for grand larceny, and were

tried and acquitted.   If the defendants had been con-
victed, officers and witnesses who rendered services
in the case, but received no compensation under the
Act, would have been entitled to fees or compensa-
tion as follows:

Hunter, the Clerk of the Court_____$4 30
Carnes, the Sheriff of the county_____ 5 00
Taylor, a Justice of the Peace, who bound the
    defendants over for trial _____ 2 65

Witnesses for the State:

Marlet, fees and mileage _____$6 00
Wilkens, fees and mileage_____ 6 00
Shore, fees and mileage _____ 6 80
Hall, fees and mileage _____ 6 80
Kelley, fees and mileage _____ 6 96
Battle, fees and mileage _____ 6 80

It is said the Act in question is unconstitutional
and invalid because it demands the particular services
of individual citizens as officers and witnesses, and
takes their property for public use without compen-
sation; that the law is partial in its application, and
not a general law of the land; that it deprives per-
sons accused of a fair and impartial trial; and that
it amends or repeals quite a number of former Acts,
but does not, in its body or caption, recite or refer
to such Acts.

To be more explicit as to the grounds of objec-
tion, it is said that witnesses and officers are required
to give their time and services, and to pay their
own expenses, upon the trial of certain cases, and

Henley v. State.

are refused any fees therefor. It is insisted that time and labor and money expended by witnesses while at trial, or *en route*, represent just so much property which is thus taken without compensation, and the officers and witnesses are in this way required to give to the State, without pay, that which is valuable to themselves and necessary to their families, while other citizens of the State in such cases are required to contribute nothing.

It is urged, with much earnestness and force, that the services and property of the citizen are protected by the same section of the bill of rights, and that under it his time and services can no more be taken without compensation than can his farm or his flocks, and it is tersely said that the State has no more right to require an individual's time and services to make a convict, without compensation, than it has to take the same individual's corn or wheat, without pay, to feed the convict after he is made, and that such requirement violates the rights of the individual, even though it may be a benefit to the public.

It is further insisted that when the bill of rights was declared in 1796, the common law in America was that witnesses for the State should be paid for their services, and the Constitution provides that the laws then in force should be preserved and remain in existence as though the Constitution had not been framed.

It is conceded that there is a sovereign power superior to the Constitution and not limited by it,

and that it is the prerogative as well as the duty of this sovereign power to preserve the State in great emergencies, and, if necessary, to take the property, time, and services of individuals for this purpose, and, if need be, without compensation.

To illustrate: A man's property, time, and services, it is said, may be required without pay in case of war or invasion, or an individual may be placed in quarantine, and temporarily deprived of his liberty, if the public safety demand; but these, it is argued, are emergencies, and not matters arising in the ordinary administration of the government. In the ordinary conduct and operation of the government no such emergencies can arise, and in the usual course of administering the affairs of the State no such demands can be made of the citizen.

It is insisted that if a Justice of the Peace or Sheriff, Clerk or witness, is required to render service for the State without compensation, it is to that extent taxing his property and labor, and requiring him thus to bear an unequal part of the burden of the public expense, and that inequality in burdens, whether in the shape of taxes imposed, services required, or property taken, is contrary to the letter and spirit of the Constitution, and to the genius of our government.

Again, attention is called to the fact that it is claimed by the State that it is the object and purpose of the law to relieve the State from the immense burden of criminal costs, and it is said that

while this is a laudable purpose, and may result in the relief of the State to the extent of many hundreds of thousands of dollars now annually paid out for the prosecution of criminals, still the Act is so framed as to operate unjustly, inasmuch as it does not prevent or extinguish these costs, but simply shifts the burden of bearing them from the body of taxpayers on to the shoulders of the few who, from locality, situation, or other circumstances and conditions, are required to bear them. In other words, the argument is that costs remain the same as heretofore, but they are required to be borne by the few whose time and services are taken without pay, while the many who contribute neither time nor service can give the proceeds of their labor to their own advancement and the benefit of their estates and families, relieved of all burdens.

Again, it is insisted that the law is partial in its application and operation, and not the law of the land, which affects all individuals alike.

It is said there is a discrimination made between witnesses and officers that is arbitrary, and based upon no legal or reasonable ground. To illustrate: In eight named felonies witnesses are paid whenever trial is had, no matter what the result may be, but unless a verdict is reached, there is no compensation. Attention is called to the fact that a prosecution for one of these offenses may be pending for a time, and costs may accrue. It may then be terminated by death or by the State refusing to

further prosecute. In these contingencies, witnesses receive no pay, while, if the case had proceeded to verdict, they would be paid. At the same time they have no voice in saying whether the case shall proceed or not, but in each case they are compelled to give the same time and service, and incur the same expense during the trial or trials.

Again, in other cases witnesses are paid only in the event the accused is convicted. To illustrate: When trials are had but no convictions result, if the crime is rape, the witness is paid; if it is attempt to rape, he is not paid. In bigamy he is paid; in attempt to poison, he is not paid. In embezzlement, he receives pay; in fraudulent breach of trust, he does not. As a summary, it is stated that, in homicide, rape, robbery, burglary, arson, embezzlement, incest, bigamy, witnesses and officers are paid if a verdict is reached, no matter what that verdict may be; but, in horse stealing, masked marauding, corrupting jurors, suborning witnesses, bribe taking, railroad wrecking, and a large number of other felonies, embracing the great body of criminal offenses, costs are not paid by the State unless the defendant is convicted and the costs cannot be made out of him.

Again, it is said a witness who attends Court from another county than that in which the prosecution is had receives his per diem, but if from the same county, he receives nothing. It is insisted that the discrimination between witnesses is thus made to

Henley *v.* State.

turn upon the result of the trial or the local situation of the witness, whether in or out of the county, and not upon the legal nature of the offense, nor in every case upon the magnitude of the crime; and the argument is that the inevitable tendency is to prejudice the accused in his trial, and lead to his conviction.

So, also, as to the fees of Justices of the Peace, the contention is that they are dependent upon the final conviction of the accused. But conviction cannot result unless the accused is bound over for trial upon the merits, and hence the Justice is interested to the extent of his fees in binding the accused over to trial and securing his conviction. And the same rule applies to Sheriffs and Clerks, inasmuch as their compensation depends upon conviction. It is, therefore, argued that the Justice's Court cannot be an impartial tribunal, since his own interest always weighs in the balance in favor of the guilt of the accused. So, also, with Clerks and Sheriffs, to the extent of their influence and opportunity they will be tempted to use them to secure the conviction of the defendant, inasmuch as their compensation depends upon it.

Again, it is said the Act inevitably operates to prevent a fair and impartial trial of the accused. The argument is that, under its provisions, officers and witnesses are, to the extent of their compensation, interested in the conviction of the accused in a large number of cases, since it is only in the

event of conviction they can obtain any compensation. It is argued that not only is this true, but, as to witnesses especially, they are compelled to bear their personal expenses while attending Court, and can only look for reimbursement of actual outlays if the accused is convicted, and thus their money is required without any compensation or reimbursement. It is urged with great earnestness that the result is to make officers and witnesses alert to secure convictions, and thus to prejudice the accused upon his trial.

Finally, it is said also that the Act is in conflict with many other laws standing upon the statute books, and yet these conflicting laws are not repealed, modified, or even referred to in the Act, and it is insisted that, for this reason, the Act is inoperative, unconstitutional, and void under Art. II., Sec. 17, of the Constitution, which provides that all Acts which repeal, revive, or amend former laws shall recite in their caption, or otherwise, the letter or substance of the law repealed, revived, or amended.

We have thus briefly gone over the several objections which have been urged to the constitutionality and validity of this Act, but we have not dwelt upon the details, nor referred to the many able arguments and reasons which have been urged in support of the views advanced. Some of them will be referred to in the further discussion of the matters involved, but all of them cannot be presented in any reasonable space or time.

We are admonished by the subject-matter of the Act, of its extreme importance. We are cognizant, also, of the intense public interest which hangs upon the decision of the case. We approach its consideration with a due sense of the responsibility which rests upon us. With the wisdom, propriety, desirability, and policy of the Act, this Court can have nothing to do: These are matters which appeal to the intelligence, patriotism, and discretion of the General Assembly, and upon that department of the government rests the responsibility for the wisdom and sound public policy of the law. That body is composed of representatives fresh from the people, and charged by the people with the duty of providing such legislation as will correct the abuses of the body politic and at the same time provide wise measures for the benefit of the State. These representatives are, or should be, in touch with the people; should know their wishes, their burdens, their plans for relief, and this Court, in passing upon an Act designed to affect the whole people and to correct what is said to be a great public evil, can question the Act only so far as it touches the fundamental law, and measure it by the provisions of that law, and determine whether it has in any particular passed the limits placed upon the power and discretion of the Legislature by the Constitution.

Mr. Cooley, in his work on constitutional limitations, says: "Except when the Constitution has imposed limits on the legislative power, it must be

considered as practically absolute, whether it act according to natural justice or not in any particular case. The Courts are not the guardians of the rights of the people of the State except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise or oppressive legislation within constitutional bounds is · by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil, but Courts cannot assume these rights. The judiciary· can only arrest the execution of a statute when it conflicts with the Constitution. It cannot run a race of opinions upon points of right, reason, ‚and expediency with the law-making power. Any legislative Act which does not encroach upon the powers apportioned to the other departments of the government, being *prima facie* valid, must be enforced unless restrictions upon the legislative authority can be pointed out in the Constitution, and the case shown to come within them. The moment a Court ventures to substitute its own judgment for that of the Legislature, in any case where the Constitution has vested the Legislature with power over the subject, that moment it enters upon a field where it is impossible to set limits to its authority, and where its discretion alone will measure the extent of its interference.'' Cooley Con. Lim. (6th Ed.), 200, 201. Our own decisions are thoroughly in accord with this view. *McGinnis* v. *State,*

Henley *v.* State.

9 Hum., 47; *Washington* v. *Mayor*, 1 Swan, 180; *Davis* v. *State*, 3 Lea, 378; *Ballentine* v. *Pulaski*, 15 Lea, 634; *Lynn* v. *Polk*, 8 Lea, 229; *Peck* v. *State*, 2 Pick., 262; *Williams* v. *Nashville*, 5 Pick., 488; *Cole Mfg. Co.* v. *Falls*, 6 Pick., 481; *Sutton* v. *State*, 12 Pick., 698.

It is the settled rule in Tennessee, and in the United States generally, that the Legislature has unlimited power to act in its own sphere of legislation, except so far as restrained by the Constitution of the United States and the Constitution of the State. *Bell* v. *Bank*, Peck., 269; *Hope* v. *Deaderick*, 8 Hum., 8; *Davis* v. *State*, 3 Lea, 377; *Stratton* v. *Morris*, 5 Pick., 497; 3 Am. & Eng. Enc. L., 689.

If the Act, therefore, does not violate some provision of the Constitution, this Court has no jurisdiction or power to lay hands upon it and arrest its execution, whether its provisions are wise or unwise, whether its operation be hurtful or beneficial. If, in the opinion of this Court, however, it does in any material respect violate the fundamental law of the land, it is the duty of this Court to so declare and prevent its enforcement.

This Court does not exercise arbitrary powers in construing either statutes or constitutions. Ordinarily, it will indulge every reasonable intendment favorable to the constitutionality of a statute passed with the required formalities, and a law upon trial for its constitutionality is entitled to the benefit of every reasonable doubt. *Morrell* v. *Fickle*, 3 Lea, 81; *Garvin* v.

*State,* 13 Lea, 162; *State* v. *Yardley,* 11 Pick., 550; *Cole Mfg. Co.* v. *Falls,* 6 Pick., 466; *Ellis* v. *State,* 8 Pick., 93; Cooley Con. Lim. (6th Ed.), 218; 3 Am. & Eng. Enc. L., 673, 674; Sutherland on Statutory Cons., Sec. 332.

Not only is this so, but that construction will be favored which will sustain the law, if it admits of question and doubt. *Home* v. *Railroad,* 1 Cold., 74; *Railroad* v. *Crider,* 7 Pickle, 506; *Ellis* v. *The State,* 8 Pickle, 93; *Cole Mfg. Co.* v. *Falls,* 6 Pickle, 466; *The State* v. *Yardley,* 11 Pickle, 546–554.

Hence, it is the settled rule of this Court that he who insists upon the unconstitutionality of an Act must point out the specific provision of the Constitution which it expressly or by unavoidable implication violates. It cannot be annulled upon supposed natural equity, the inherent rights of freemen, or upon any general or vague interpretation of a provision of the Constitution beyond its plain and obvious import. *Davis* v. *The State,* 3 Lea, 377; *Stratton* v. *Morris,* 5 Pickle, 497.

Mr. Cooley tersely says: "Nor are the Courts at liberty to declare an Act void because, in their opinion, it is opposed to a spirit supposed to pervade the Constitution, but not expressed in words." Cooley on Const. Lim., 6th Ed., p. 204.

And whether a statute is contrary to the genius of a free people is a question for the Legislature, and not the Courts. As bearing upon this question, we cite *Bell* v. *The Bank,* Peck, 269; *Hope* v.

*Deaderick,* 8 Hum., 8; *Demoville* v. *Davidson Co.,* 3 Pickle, 220; *Stratton* v. *Morris,* 5 Pickle, 511; *Reelfoot Lake* v. *Dawson,* 13 Pickle, 159; *Davison* v. *The State,.* 3 Lea, 377; *Luehrmann* v. *Taxing Dist.,* 2 Lea, 438.

It is insisted that the Act violates Sec. 21, Art. I., of the Constitution, which is in these words: "That no man's particular services shall be demanded or property taken or applied to public use, without the consent of his representatives, or without just compensation being made therefor."

Is is evident that the term "particular services" used in this section must be given some significance and meaning. It will be noted, also, that a distinction is made between "particular services" and "property," or both would not have been mentioned in the same connection.

This provision has been debated before us, in the main, as though it read that particular services should not be demanded without both the consent of the representative and just compensation, and we will so treat it in the disposition of the case.

It will be noted, however, that the disjunctive conjunction "or" is used, and a plausible if not the natural construction would be that either the consent of the representative or just compensation would warrant the taking of such services. It is not, however, desired to place the determination of the case upon such construction. We have not had the opportunity to trace the history of this phrase "par-

ticular services'' in order to ascertain its origin -or its primary application. It is found in identically the same language in the Constitution of 1796, 1834, and 1870. It comes first into our judicial history with the ordinance of the Continental Congress, passed in 1787, for the government of the territory north-west of the Ohio River, and in 1790 was extended to the territory southwest of that river. It was not carried into the Federal Constitution, and has been inserted, so far as our investigation has gone, into the Constitutions of only three States — Tennessee, Indiana, and Oregon.

Particular services must mean peculiar services; limited services; not ordinary or general services of an individual. It is not an easy matter to draw the distinction between particular and ordinary services in every instance, still some general rules may be given to mark the line. It seems clear that ordinary services, such as may be required of all citizens, or officials, by general or valid special laws, are not particular services. A single illustration may suffice: A physician cannot be required to give his time and services and skill and scientific knowledge in making an examination to qualify him to speak as an expert witness. If, however, the same physician may have already made an examination and come into the possession of facts material to be disclosed to attain justice and administer the law, he may be required to testify to them as any other witness may.

In Indiana the constitutional provision is, "No man's particular services shall be demanded without just compensation." Constitution of Indiana, Art. 1, Sec. 21. In *Israel* v. *State*, 8 Indiana (James), 467, it was held that the services of witnesses in criminal suits were not "particular services" within the meaning of the provision, but were general services, such as every individual was bound to render when called upon for the public welfare as well as his own individual good.

In Oregon the constitutional provision is: "Nor [shall] the particular services of any man [be] demanded without just compensation." Art. 1, Sec. 19, Oregon Bill of Rights. In the case of *Daley* v. *Multnomah Co.*, 14 Oregon, 20, this provision was construed. An Act was passed to prescribe the fees of witnesses in Multnomah County, and it provided that in all criminal proceedings and actions, witnesses residing within two miles of the place of trial or where they were required to appear and testify, should not have either fees or mileage." Session Laws, Oregon, 1885, p. 10.

It was contended this was contrary to the provision of the Constitution.

The Court held, in the language of the Indiana case above cited, that "it is as much the duty and interest of every citizen to aid in prosecuting a crime as it is to aid in subduing any foreign or domestic enemy, and it is equally the interest and duty of every citizen to aid in furnishing to all, high and

low, rich and poor, every facility for a fair and impartial trial when accused, for no one is exempt from liability to accusation and trial. These are matters of general interest and public concern—are vital, indeed, to the very existence of free government—and render the services of witnesses on such occasions matters of general public interest, and not 'particular' in the sense of the Constitution."

This construction is approved, also, in the cases of *Buchanan* v. *State*, 59 Ind., 12, and *Dills* v. *State*, 59 Ind., 18.

In our own State we have the case of *Washington* v. *Mayor of Nashville*, 1 Swan, 180. In it the laying of a sidewalk in front of his own property was refused by Washington, upon the ground that it was the "taking of his particular services" without compensation.

The Court held the contention not maintainable, and said: "The principle upon which this power of legislation is exercised is that plain and universal one, indispensable to the administration of government, that the public has a right to the contribution of the money and personal services of all its citizens whenever the public interests and exigencies demand it, in consideration of the protection it affords to life, liberty, reputation, and property."

In *Wright* v. *State*, 3 Heis., 256, it was held that the services of an attorney might be required to defend a prisoner, and without compensation, and this was reaffirmed in *House* v. *White*, 5 Baxter, 692,

where the Court says: "The principle of the organic law which forbids the demand of anyone's particular service has no application, to such a case. When a lawyer receives a license, he takes it burdened with these honorary obligations."

But it is said that attorneys are officers, of the Court, and for this reason their services can be required. So also are Sheriffs and Clerks officers of the Court, and, upon principle and analogy, service may be required of them also. The lawyer takes his license burdened with the obligation to defend pauper prisoners, so the Sheriff and Clerk must take their offices burdened with similar conditions and requirements.

In *Neely* v. *The State*, 4 Bax., 174, it was held that service upon the jury was not a particular service for which compensation might be demanded or the service refused. The Court in that case said: "It is one of the implied and necessary conditions upon which men form governments that sacrifices must be made by individuals for the common good, for which no compensation can be claimed. Such sacrifices of time or personal service, or of property, are compensated for in the protection which the government furnishes for their rights of person and of property. Hence, whenever, in the judgment of the Legislature, it becomes necessary to require the service of jurors in carrying on the Courts, their services may be demanded, and, if need be, without compensation, but they must be required in

JACKSON:

pursuance of laws enacted for that purpose by the Legislature."

Citizens may be required to work on the public roads, were required to serve in the militia, to serve as officers at elections; witnesses may be compelled to appear and testify for insolvent suitors; Clerks may be compelled to issue process in such cases; a Sheriff may be compelled to execute such process; jurors may be compelled to serve for a day. In all such cases the only compensation received is that benefit which results to the community at large. There are numerous other cases in which officers and witnesses are denied compensation out of the public treasury for their services.

A witness who is a prosecutor in a misdemeanor case is allowed no compensation. Code (Shan.), § 7600. Witnesses are allowed for only one day before the grand jury, and for only a prescribed number of days and cases at the same term. District attorneys are allowed only half fees when paid out of the county treasury, upon conviction and return of *nulla bona.* Code (Shan.), § 6379.

They get no fees upon a *nolle prosequi* of a misdemeanor, or when the indictment is ignored, or the prosecution fails by their fault. Code (Shan.), §§ 7590, 6380, 6383. Only half fees are allowed on acquittals. Shan., § 6376, and numerous similar instances may be cited.

But there is another view of this matter of costs against States and counties that must be considered.

The right to costs is not a common law right, but depends wholly upon statute. The rule was that the king should neither pay nor receive costs. The former was his prerogative and the latter was beneath his dignity. The same rule is applied in the United States in suits, either civil or criminal, in which the Federal or State governments, including county and municipal corporations, when acting as an arm or agency of the State, are parties, and they are accordingly only liable for costs when the lawmaking power by statute has made them so. 5 Am. & Eng. Enc. Plead. & Prac., 151. Hence, a Court cannot, ex officio, give costs for or against anyone. Mooneys v. State, 2 Yer.; 578; Morgan v. Pickard, 2 Pick., 208.

And, in all cases, the strictest rule prevails in construing the liability of the State therefor. State v. Odom, 9 Pick., 446.

And the same rule applies in regard to counties. State v. Blackburn, 33 S. W. Rep., 530.

So, a statute making the Sta ''able for all costs of criminal cases is construed , mean only State costs, and not costs of defendan.. State v. Barton, 3 Hum., 13; Prince v. State, 7 Hum., 137; Tucker v. State, 2 Head, 556.

And a statute giving costs in general terms, though unqualified, will not make the State liable therefor. 3 Bl. Com., 399; 3 Am. & Eng. Enc. Plead. & Prac., 151, 152; 4 Am. & Eng. Enc. L., 314, 316, 323; Endlich on Inter. of Statutes, Sec. 161.

The Courts and Legislatures have always treated the granting of costs against the State and county as a matter of purely legislative discretion and policy, and not a matter to be left to the Courts, except as to their apportionment between the parties in equity cases.

As to what costs shall be allowed against the State and county is a matter which addresses itself solely to the wisdom and discretion of the General Assembly.    It is true, costs have been allowed by statute from time to time, until it is asserted a vast system has grown up and settled down upon the public treasury, and, in the opinion of the Legislature, the payment has become burdensome, and a menace to the interests of the public.    It was this condition of affairs which prompted the passage of the Act in question, by which the Legislature, in effect, refuses to pay costs or allow judgments or appropriate money for such purposes out of the public treasury in certain cases.    The Constitution, Art. XI., Sec. 24, provides that no money shall be drawn from the State treasury but in consequence of appropriations made by law; and it is further provided that the State shall be liable to suit only in such manner and in such Courts as the Legislature may direct.    Constitution, Art. I., Sec. 17.

Under this provision of the Constitution, it is held that, even if the State consent to suit, she may withdraw that consent, while the litigation is pend-

ing. *Watson* v. *Bank*, 3 Bax., 395; *State* v. *Sneed*, 9 Bax., 479.

The State has accordingly refused to allow herself to be sued, even upon her solemn bonds, impressed with her great seal, and containing upon their face a pledge of the faith and credit of the State, and this Court has upheld the law. *Lynn* v. *Polk*, 8 Lea, 121.

It may result in an apparent or real hardship to officers and witnesses to be denied fees, still it is not a question of constitutional authority, but of legislative policy and wisdom.

In *Avery* v. *State*, Judge McFarland said:

"There is an apparent hardship in requiring the Clerk to perform services for which he may, in the event the defendant is insolvent, and in other events, receive no compensation, as there is in requiring a defendant who is found not guilty to defend himself at his own expense; but so the law is written, and there are perhaps other equally hard cases for which the law makes no provision."

The Legislature has from time to time attempted to check the evil of excessive costs. By the Code of 1858 officers are forbidden, under severe penalties, to demand fees when not authorized by law. Sec. 4517. In no case are they entitled to payment from the State or county unless expressly allowed. Code, § 5561.

One article of the Code of 1858 was entitled: "Provisions to prevent the accumulation of costs"

in criminal cases. It required the Court to designate a day for the call of the State docket, and to adopt rules that would "tend to diminish the costs of such cases." The Attorney-general is required to have indictments ready, and "to so manage the State's business as to detain witnesses only one day to go before the grand jury." The Clerk is forbidden to issue subpœnas for State witnesses, except upon the written order of the Attorney-general. Witnesses are allowed only one day's attendance before grand jury, "unless longer retained by order of the Court." The Judge and Attorney-general are required to examine and certify all bills of costs, and the Comptroller and Chairman of the County Court are forbidden to pay except upon such certificates, and are also required to examine the bills. These provisions, and others of a like character, indicate that even prior to 1858 there was some appreciation of the difficulties of keeping this matter of criminal costs within due bounds. Code, §§ 5594, 5604 (1858).

But the provisions of the Code of 1858, stringent as they were, proved ineffectual to protect the public treasury against the payment of unjust, excessive, and fraudulent bills of cost. To remedy or mitigate this evil, several statutes have been enacted since 1858. Only the more important of these will be noticed.

Acts 1879, Chap. 210, undertook to discourage the accumulation of costs by making it a misdemeanor to speculate in witness or officers' fees, ex-

cept "witness fees traded for merchandise or hotel bill." The constitutionality of this Act was promptly and vigorously assailed. This Court, at its December term, 1879, sustained the Act, saying that the argument impeaching it was "made to turn on general principles rather than on any specific provision of the Constitution." Of the objects of the Act the Court says: "The Legislature intended to break up a particular kind of speculation in these fees which it thought detrimental to the public interests, etc. Of the wisdom of the Act the Legislature, the law-making power, is the exclusive judge." *Davis* v. *State*, 3 Lea, 376.

While this Act continued in force, the occupation of the speculator in fees was gone. Professional witnesses, unable to get ready cash for their fees, were greatly discouraged. This Act was, however, repealed by the Acts 1881, Chap. 51, having been in operation about two years.

Acts 1889, Chap. 139, was afterwards enacted, authorizing and requiring the Judges and Attorneys-general, whose duty it is to certify Justices' bills of cost for payment, to go behind the Justices' certificate as to their correctness, and to examine and inquire into such bills fully, and to disallow them if it should appear that the prosecution "is frivolous, malicious, or commenced to procure fees."

This statute, it is alleged, was brought about by the acts of Justices and Constables and witnesses, who, in many instances, it is charged, had conspired

together to defraud the State and oppress the people for tho selfish, mercenary purpose of gain. This Act met with vigorous opposition. It was not strictly enforced. Finally, however, it came before the Supreme Court, at Knoxville, and this Court approved and sustained the Act. Upon authority of this opinion many thousands of dollars of costs was stricken out in Knox County alone. By Acts of 1891, Ch. 22 (Ex. Ses.), another advance step was taken in this matter by the Legislature. This statute changed, from the State to the county, the costs of the prosecution of felonies, when the cases were disposed of before trial.

The striking reform features of the Act, however, were that it authorized and required the Judges and Attorneys-general to examine all bills of cost in criminal cases, and to disallow any that might be "illegally or wrongfully taxed against the State or county," and authorized and required the Comptroller and Judge or Chairman of the County Court, to examine into all certified bills of costs, and to disallow any that had been "illegally or wrongfully taxed against the State or county," and provided, finally, that "the State Comptroller and Judge or Chairman of the County Court, may disallow any and all cost taxed against the State or county on account of malicious, frivolous, or unnecessary prosecution, in the event the Judge or Attorney-general, by mistake or otherwise, approved any of such bills." This Act has been before this Court more than

once for construction, and its validity has never been seriously questioned. *Stout* v. *State*, 7 Pickle, 405.

The next in order of time is the Act of 1895, defining larceny and making the counties liable for costs of prosecution for that offense. Acts 1895, Ch. 205. This Act was declared unconstitutional on account of a defective caption. *Shelton* v. *State*, 12 Pickle, 521. This was the last effort of legislation to suppress the growing evil of criminal costs before the passage of the present Act.

Every Act passed by the General Assembly to prevent the accumulation of unnecessary and improper costs has been upheld by this Court, if the Act was passed with the formalities required by the Constitution, and without any question as to its wisdom. The necessity of some further legislation appears from the fact that all former efforts, seemingly well directed, to remedy the evil and diminish criminal costs had failed, in a large measure, of the desired results.

In the arguments we are furnished the following table, prepared by the State Comptroller, which indicates the extent of the State's liability for costs of criminal prosecution:

TABLE OF AMOUNTS PAID FOR CRIMINAL PROSECUTION FROM 1876 TO 1894, INCLUSIVE.

| | |
|---|---|
| Dec. 20, 1876, to Dec. 19, 1878 | $393,406 71 |
| Dec. 20, 1878, to Dec. 19, 1880 | 399,443 20 |
| Dec. 20, 1880, to Dec. 19, 1882 | 357,895 15 |
| Dec. 20, 1882, to Dec. 19, 1884 | 378,255 39 |
| Dec. 20, 1884, to Dec. 19, 1886 | 385,112 69 |

Henley *v.* State.

Dec. 20, 1886, to Dec. 19, 1888 _____$378,131 11
Dec. 20, 1888, to Dec. 19, 1890 _____ 398,708 82
Dec. 20, 1890, to Dec. 19, 1892 _____ 415,214 11
Dec. 20, 1892, to Dec. 19, 1894 _____ 490,680 40
Dec. 20, 1894, to Dec. 19, 1896 _____ 417,615 34

The above does not embrace salaries of Judges or prison expenses. The cost paid by the counties is a little more than double the amount paid by the State.

In a recent case of *Leahy* v. *State*, at Knoxville, this Court disallowed fifty-eight out of sixty-eight bills of cost sent up by a Justice of the Peace from Knox County to the County Judge of that county. The cases were declared frivolous, and the entire bills of cost, amounting to thousands of dollars, including fees of witnesses, were disallowed. The protection of the public from improper costs was a paramount consideration, and this was done by this Court in pursuance of statutes enacted by the Legislature. The constitutional guarantee of compulsory process to require witnesses to attend Court and give evidence does not require the State to provide for the expenses of obtaining their attendance. *Avery* v. *State*, 7 Bax., 331. And witnesses may be compelled by the State to attend and give evidence without compensation. *Burnett* v. *Kroth*, 1 Am. St. Rep., 248.

If it be conceded that there is an absolute obligation to give compensation, it is equally imperative that such compensation be just, and yet it is well known that the services of one witness may be worth

many times that of another. The service of an expert in one department is much more costly than that of another in a different department.

It is said the Act is a revenue measure. This is not correct. It is not a mode of taxation. It is a measure not to collect money but to protect that which has already been collected from the taxpayers. There is also a marked difference between taking the services of an individual and taking his property under the law of eminent domain. *Taylor* v. *Chandler*, 9 Heis., 360.

It is proper to remark, also, that there is nothing in the Act in question that requires any service of any officer or witness. The Act nowhere provides that witnesses shall attend or that officers shall do service of any kind. These matters are all provided by other Acts, which are not brought in question in this suit, but none of them are required by the terms of this Act. No officer or witness has declined to render service, and the question is not presented whether such witness or officer can be required to render service where he will not receive compensation. When some officer or witness does refuse such service, the question may arise whether they can be required, in view of the fact that they will not or may not receive compensation. Here the service has been rendered without protest or objection, and the only question is, whether the State shall be required to pay for such service contrary to the provisions of this Act.

But it is said the Act is not general, and thus made the "law of the land," but is partial in its operation, and limited to classes, and these classes are not marked by natural and reasonable lines, but by tests which are arbitrary and capricious. "The law of the land" is defined to be a law which embraces all persons who are already or who may thereafter come into similar situations, conditions, and circumstances. *Mayor* v. *Dearman*, 2 Sneed, 204; *State* v. *Rancher*, 1 Lea, 97; *Davis* v. *State*, 3 Lea, 397; *Maney* v. *State*, 6 Lea, 221; *Hatcher* v. *State*, 12 Lea, 371; *Woodard* v. *Brien*, 14 Lea, 523; *Stratton* v. *Morris*, 5 Pick., 499.

It is also held that if a law is intended to affect particular classes only, it must, in order to be valid, not only apply to all persons who are or may be in like circumstances, situations, or conditions, but the classification must be natural and reasonable, not arbitrary and capricious, and must rest upon some sound and legal ground. *Bank* v. *Cooper*, 2 Yer., 600; *State* v. *Staten*, 6 Cold., 233, 245; *Knox* v. *State*, 9 Bax., 202, 207; *Stratton* v. *Morris*, 5 Pickle, 542; *Dugger* v. *Insurance Co.*, 11 Pickle, 245, 258; *Sutton* v. *State*, 12 Pickle, 696, 710; Anderson's Cons. Law, 37; Cooley's Cons. Limitations, 390; *Ex parte Jentzech*, 32 L. R. A., 664, 666; 3 Am. & Eng. Enc. L., 697. These cases lay down the general rules of law relating to the matter of classification. It is difficult to see how

these cases or the matter of classification can apply in this case.

We have already held that neither the State nor county is liable for any costs unless the Legislature has so provided. It is therefore simply a question whether the State and county will pay costs for certain services, and is not a matter of partial or class legislation. But if it were, from the very nature of the case, the General Assembly must, to a very large degree, be the judges as to whether the classification adopted is reasonable or capricious. That body, more than others, is acquainted with the evils and abuses which it is desired to correct and with the ways and means at their command to remedy such abuses and evils.

Its members come from every section of the State, and can take a wider view of the entire situation than can be taken by the Courts. So it may, in its wisdom, deny costs altogether or allow in such cases and to such extent as it may deem best in the exercise of a sound public policy. While, therefore, it is not incumbent on this Court to critically question the classification adopted, and it would be improper to do so, still it is easy to see the general idea and system which has been adopted, and the reasons for the discriminations made.

It is the evident general purpose to insure the vigorous prosecution of the eight principal felonies named because they are the most heinous crimes, and, at the same time, cases in which frivolous and

unfounded prosecutions are most rarely met with.
In regard to the smaller felonies and misdemeanors,
the evident purpose is to discourage and prevent the
large number of frivolous and groundless prosecutions
which have caused such a burden of expense on the
State and county. This evil of frivolous prosecu-
tions for misdemeanors and the smaller felonies, it
is claimed, has gone to an enormous extent, and it
is stated that they are not, in a majority of cases,
prompted by any other motive than a desire to tax
up fees and costs, and to certify them for payment
to the Treasurer of the State and counties, and,
while it is conceded that abuses may result from the
operation of the Act in question, it is maintained
that they cannot reach such proportions as now ob-
tain in the unfounded prosecutions set on foot and
pressed, not for the public good but to create fees
for officers and witnesses.

The classifications of the law in regard to the
compensation of witnesses, are likewise based upon
what is called the attendance and service of profes-
sional witnesses. It is alleged that there is a class
who make a business of giving testimony, especially
in minor criminal offenses. These are found resid-
ing around the courthouses and places of trial, and
hence the law provides no fees or mileage for a
witness who resides within five miles of the place
where he attends as a witness. In case of such
witnesses, when worthy of any fees, attendance is
not such a burden as it is when he lives more re-

mote or beyond the limits of the county. Whether the classifications as to witnesses and as to crimes may prove the best that can be made may admit of question. At any rate they are not without grounds and reasons which the Legislature deemed sufficient.

We come now to inquire whether the law deprives a man of a "fair and impartial trial." It seems to have been assumed in many quarters, but not in argument, that the Constitution provides that every accused person shall have a fair and impartial trial. The Constitution does not contain such provision. Its provisions are that the accused shall have the right to trial by a jury, and that right shall remain inviolate. In what does the right consist, and what is its extent so far as the Constitution goes? It is that the trial shall be speedy and public; that the jury shall be impartial; that the accused shall have the right to compulsory process for his witnesses, to have them present in person at the trial, to meet them face to face; that he shall have the right to be heard by himself and counsel; and that he shall not be compelled to testify against himself; and that he shall have a copy of the accusation against him.

There is no provision for impartial Sheriffs or impartial Clerks or impartial witnesses. Indeed, such a requirement would go beyond the power of the Legislature. It is true that our cases speak of "fair and impartial trial." But these are, at best, but comparative terms. It is beyond the reach of

the Legislature to secure a trial absolutely fair and impartial, and, when the term is used, it means a trial under the Constitution and according to law. *Clapp* v. *State*, 10 Pickle, 186.

Let us look for one moment at this matter of an impartial trial as it affects the witnesses in a case. It is a matter of common observation that witnesses are partisan, prejudiced, and often directly interested either in conviction or acquittal of the accused. To such an extent is this true that the principal office of counsel is to point out the untrue, biased, and prejudiced statements of witnesses, and one of the chief difficulties in reaching justice is in penetrating their evasions, deceptions, and prevarications. Every charge to the jury warns them to beware of this interest and bias of witnesses.

No constitutional convention or General Assembly ever supposed for a moment that witnesses could, by any legislative means, be rendered impartial. On the contrary, under the law, defendants are allowed to testify in their own cases, when it is evident that their evidence cannot be impartial. So, also, the prosecutor is allowed to testify when, in a large number of cases he cannot, while smarting under the wrong inflicted on him and his desire to bring the accused to punishment, be impartial.

It is said, however, that a moneyed inducement is offered to officers and witnesses to convict the defendant. In other words, it is only in cases of conviction that fees and compensation can be secured.

If we grant this to be true, still it is a matter which addresses itself to the wisdom and discretion of the General Assembly. *Grundy & Co.* v. *Tenn. Coal Co.*, 10 Pickle, 295.

It cannot be denied that designing men can prostitute almost any proceeding to selfish, improper, and corrupt purposes. The State is as much interested, even more concerned, in preventing the annoyance and vexation of the citizen by unfounded and frivolous prosecutions than she is in bringing real offenders to trial and punishment. If the new law says, in effect: "Convict, and you shall be paid," the old law says, "Prosecute, and you shall be paid whether you convict or not." If the new law offers an inducement to convict, the old law offers a still more potent and ready inducement to prosecute, whether there is or is not ground for it. It is placing a low estimate upon the integrity of the citizen to assume that for a paltry sum he will be willing to perjure himself and do injustice to his fellows, and the General Assembly may have acted upon this view and been content to trust the honor and integrity of the people, as it must do in every law and under every emergency.

It is claimed that under the existing system abuses of gigantic magnitude have sprung up, and have grown and flourished and fattened upon the public treasury. We are told that this has gone to such an extent that speculation in prosecutions has become a business in the cities and towns. Whether

it is a greater evil to incur the remote probability that some innocent man may be convicted from mercenary motives, or to encourage the present wholesale bringing of trivial and baseless charges and prosecutions in order to obtain fees, can hardly admit of question. It will be noted that the Act guards the jury from any supposed improper influence, by providing for its payment in any event, as heretofore. Also, as to Justices of the Peace, it is evident that the influence supposed to operate upon them is quite remote and indefinite. In the event of submission, which is the only case in which the Justice disposes of the matter, final provision is made for his fees. In all other cases he has power only to bind over the accused to be tried in another tribunal, and in that tribunal the Justice has no voice.

It is evident that under this Act the Court and jury are left impartial, as before—nothing that affects them is left to depend upon the result of the trial. The fees of the Sheriff or other officers for summoning and attending upon the jury are still paid out of the treasury, and not taxed as costs in the cases tried. Shan., § 6402, Sub-secs. 10, 11, 25; § 6410, Sub-sec. 8. The Clerk is but an amanuensis of the Court to enter its orders. If any officer is disqualified because of interest, his place may be supplied, as was indicated in the Clapp case. It will thus be seen that the Act jealously guards the prisoner's right to a fair and impartial jury.

The voice of this Act is not, we think, one of

temptation to bribery, but one of caution and warning. To officers and witnesses it utters salutary words. In effect, it says: "Beware that you do not set on foot frivolous, vexatious, or malicious prosecutions, that burden the public with costs and oppress and annoy the citizen. The name and funds of the State must not be used for this end. Bring only just and substantial and well-founded charges into Courts—such as will not only secure a favorable judgment before the committing Magistrate, but before the grand jury and before the trial jury. If you oppress and annoy the citizen with charges that are dismissed by the committing Magistrate, or ignored by the grand jury, or dismissed without trial, or cannot be sustained on a trial, then you lose your time and labor. The State and county will refuse to pay you for the fruitless and oppressive business. An exception will be made, however, as to acquittals of the eight principal felonies, as it is of great public concern that they should be prosecuted, and as they are seldom the subject of frivolous prosecutions, and from their character cannot be."

Justly construed in the light of the true situation, this is the meaning of the Act in question.

It is true, as stated by counsel, that when the Constitution of 1796 went into effect, officers and witnesses were entitled, under the law theretofore existing, to receive pay for their services, and it is also true that that instrument provided that all laws in force when it was adopted should remain in force,

14 p—45

and rights then existing should continue as though
no Constitution had been made, but it is also true
that the same section provides that all such laws
might be altered, amended, or repealed by subsequent
legislation. Constitution of 1796, Art. 10, Sec. 2;
Schedule, Sec. 1.

When, by Sec. 6 of Art. I., it was declared
that the right of trial by jury should remain invio-
late, it did not mean that no law should in the
future be passed to regulate such trials and pre-
scribe the practice in such cases, but that the right
should not be denied to the citizen, with its mate-
rial and substantial benefits. *Eason* v. *State*, 6 Bax.,
475; *McGinnis* v. *State*, 9 Hum., 47; *Trigally* v.
*Memphis*, 6 Cold., 382; *Hogan* v. *Chattanooga*, 2
Leg. Rep., 12.

Accordingly, it has been held that statutes which,
by direct enactment, make reasonable regulations as
to evidence do not violate the right of trial by jury.
*Yardley case*, 11 Pickle, 563; *Railroads* v. *Crider*,
7 Pickle, 489. New classes of witnesses—for exam-
ple, parties in civil suits and defendants in criminal
cases—are admitted, and this does not violate the
Constitution in letter or spirit. The witness, at
best, has but a scintilla of interest, and this goes
to his credibility. The right of trial by jury was
not violated by the Act prescribing that parties must
demand it in order to obtain it. No one questions
but that the accused is entitled to a fair and im-

partial trial, but it equally means a trial under the Constitution and law.

It is also true that the entire body of the common law, as it existed when the Constitution went into effect, was made the law of the land by that instrument. *McGinnis* v. *State*, 9 Hum., 43; *Trigally* v. *Memphis*, 6 Cold., 382; *Neely* v. *State*, 4 Bax., 180.

But it was never for a moment supposed that these laws could not be altered, amended, repealed, or added to by subsequent Legislatures, as they, in their wisdom, might deem best, the only restrictions being those thrown around such legislation by the Constitution.

Again, it is said that the Act is unconstitutional because it is amendatory of the general law on the subject of fees and costs, and yet does not refer to the laws thus amended.

This is not an amendatory Act. It is a new and original law. If it can be held to be a repealing law or an amending law, it is so only by necessary implication, and in such cases the Acts repealed or amended need not be referred to in the caption or certificate of the new law. *Home Ins. Co.* v. *Taxing Dist.*, 4 Lea, 650; *Maney* v. *State*, 6 Lea, 218; *Railroads* v. *Crider*, 7 Pickle, 506; *Knoxville* v. *Lewis*, 12 Lea, 181; *State* v. *Yardley*, 11 Pickle, 546, 559; *Ballentine* v. *Pulaski*, 15 Lea, 633; *Poe* v. *State*, 1 Pickle, 495; *Hunter* v. *Memphis*, 9 Pickle, 571.

We are of opinion, therefore, that the Act in question is free from constitutional objection, and this Court has no power to refuse its enforcement, whether it is wise or unwise, whether hurtful or beneficial in its tendencies and operation.

The judgment of the Court below is, therefore, reversed, and the costs allowed are stricken out as unwarranted against the State and county, and the parties interested therein will pay the costs of this proceeding in this Court and in the Court below.

Judges Caldwell, McAlister, and Beard concur in this opinion, Chief Justice Snodgrass does not concur, and states the grounds of his dissent.

---

### DISSENTING OPINION.

SNODGRASS, Ch. J. Aware of the careful and painstaking consideration this case has received, and with profound respect for the opinion of the majority, I most earnestly dissent from its conclusion that the Act under consideration is a constitutional law. No less than any one of them do I respect the expression of legislative will, and recognize the freedom of that department (so far as the policy of legislation is involved) from judicial interference. I have as little inclination as anyone to invade the legislative province or to assume the power to do so. The people have trusted the Legislature as the residuary depositary of public wisdom, and, except

Henley v. State.

in those constitutional restrictions which the people have themselves imposed as permanent barriers against the possibility of improbable mistakes by the Legislature, and those natural barriers of reason against impossible legislation and arbitrarily capricious exercise of conceded authority, the Legislature is supreme. There is no power to question its motive, its policy, or its wisdom. I recognize the fact that a Legislature without constitutional control would be practically omnipotent.

But the people did not turn loose any such unrestrained agency, without guarding carefully its power to do irreparable injury or monstrous injustice to the individual citizen. They realized that, while all Legislatures are, presumptively, wise and conservative, some would, in fact, be no wiser than other ordinary mortals, and no more conservative than the temper of the times might permit or the hasty determination of great questions occasion, and therefore limitations on legislative power were, in great numbers, adopted in our organic law.

These limitations in the Constitution of 1870 were not experiments. In the main they are reproductions of similar checks on legislative power embodied in the Constitutions of 1834 and 1796, and correspond substantially with those in the Constitutions of other States, older and younger, and are the safeguards which human wisdom taught and experience has proven necessary to the preservation of the rights of the citizen against the haste, the unwisdom, the ca-

price, or the folly of temporary authority, lodged
though it be in the selected legislative agents of the
people themselves. Our theory of government in dif-
ferent departments, as arranged in the Constitution,
is a theory of checks and balances on power in favor
of the liberty and highest rights which can be ac-
corded to the individual. To carry out its purpose,
therefore, it is essential that no restraint be put by
the judicial department on the legislative not de-
manded in our organic law, and none be relaxed
which is so demanded.

The two departments, legislative and judicial, have
their well-defined limitations and powers. The lim-
itation on legislative action was made a subject of
judicial power, for these limitations are only to be
declared and enforced by that department, speaking
through the Constitution, but for the public, and for
the ultimate public purpose, as it is the controlling
and final one. Too much stress is often put upon
the phrase "the people speaking through their rep-
resentatives" in reference to legislative action. It
is true that they so speak, but it is equally true
that they speak through every other department of
the State government, and that the final expression
of their will is made in the determination of the
validity, interpretation, and construction of law by
their judicial representatives. All the power exer-
cised by the Courts is that of the people, vested in
them by the same Constitution, which, for wise pur-
poses of government, limits the scope of legislation

and the power of their legislative representative. In respect to the declaration of law, the people, therefore, speak first through the Legislature and last through the Courts, as it is in them they have vested the power, not only of construing Acts of the Legislature, but, the Constitution itself, and enforcing through judicial process the observance of their, thus permanently declared, will.

What dire and disastrous results would have happened. in this country in national and State legislation, without constitutional restrictions and Courts wise enough and independent enough to enforce them, need not be elaborated here. The Courts have stood always above the work of haste and hate, excitement, passion, sectional animosity, oppression, and folly, and limited its operation within the bounds of justice and conservatism. To them we owe the fact that since the late war we had neither executions nor confiscation; that social as well as civil equality was not forced upon a prostrate section of our country, and the rights of the States destroyed, and it is to the same limitations and restrictions in State institutions, thus protected, that the people of this State escaped the enthrallment which would have followed legislation to fund in full the overwhelming debt fastened upon us by a rule not our own, which, when we were represented in a Legislature of our own choosing, was made obligatory and payable, and secured by a first lien on public taxes. It is the fashion now to forget these things after they

are accomplished; to trust and exalt the Constitution when we have no other protection, and to revile it when we think it stands in the way of legislation in which it is unwisely supposed we are selfishly interested. If it appear, as in the case at bar, that the legislation was intended or calculated, by any means, however oppressive on other individuals, to reduce expenses upon that proportion of our people who are taxpayers, the appeal to the Constitution is treated with contempt by a large and respectable element of the public. The assumption is indulged that as it is less expensive it is necessarily valid, and that any suggestion to the contrary is merely hostility to reform. Even here arguments are made and tables exhibited showing, or supposed to show, that the abuses under existing laws have, in special instances, swelled the volume of costs enormously in favor of certain individuals in particular counties. What this can mean in a constitutional argument I do not know, unless it be intended to indicate that present expense of administering the criminal law, on account of these abuses, is so great, as the law now is, or was at the time, and for many years before the passage of this bill, that any substitute is lawful. I beg to say that I take no stock in such arguments or tables. I have no reason to assume their correctness, but, so assuming, it only appears that there are abuses which need suppression, and which can be and should be suppressed. The law was ample for this purpose when they are

said to have originated, and, therefore, the Act under consideration was not required as a remedy.

There is no reason why like abuses may not originate under it. The truth is, and it would best be stated plainly, the object of the law was not the correction of abuses (though incidentally it might render some of those enumerated unavailing for selfish practices), but it was to take the expense of criminal prosecutions, in the main, off of the State as such, and devolve it upon a special body of its citizens—those who might hold subordinate places connected with the administration of the criminal law, as Clerks, Sheriffs, Magistrates, Constables, etc., and those who might chance to have observed the commission of crime or be aware of such facts in relation to it as would make them witnesses.

I earnestly favor an exacting and economical enforcement of law, now ample to suppress all grievances complained of, but I cannot reconcile it with my view of the constitutional rights of the great body of the people included in this classification, to devolve on them, individually, this burden of service and expense throughout the State, and for all the people of the State, because professional witnesses in our larger cities have succeeded in fooling the constituted authorities out of a few hundred or a few thousand dollars.

In the great number of counties of the State no such abuse exists, or is even alleged to exist. Their witnesses get only the poor pittance of their actual

dues, and their officers earn barely living salaries while doing faithful service to the public. The conditions of abuse (doubtless much less objectionable than they are made to appear) are, at worst, exceptional. They are special, and such as always, in some form, exist under the best laws in great or rapidly growing cities, and need special correction where they exist, rather than by sweeping and oppressive general legislation, which deprives the honest officers and the nonprofessional witnesses throughout the State of all expense and compensation.

It must not be forgotten that the professional witness abuse, so loudly complained of, is found only in a few of the larger cities of the State. He is a pest practically unknown in the numerous country counties, and, because he exists elsewhere, is no reason why they should be made to bear this great burden.

Referring to it in another aspect, I think proper to call attention to the averment that this law operates as an annual saving of hundreds of thousands of dollars. While this is greatly exaggerated, yet, let it be admitted to the full amount claimed, it only proves that so great a burden has been taken off of the taxpaying part of the public, and put upon a number of individuals poorly able to bear it, and no more than all other citizens justly subject to do so. It appears in fact, however, that for several years the average State cost per year, on this account, is a little over two hundred thou-

sand dollars, and it is worthy of special emphasis here, that the passage of this law was followed— wonderful to relate—not by a diminished but an increased rate of taxation! The amount saved to the treasury by loading this great public burden on a few of its needy poor (who in the main constitute the witness class, and to. a large extent the subordinate office-holding class), is, it would thus appear, devoted to other and supposed better uses.

I cannot speak of this great wrong, which, in my judgment it is, in terms of patience. When I contemplate a condition under which the poorest citizens throughout the State may be summoned and dragged by compulsory process from remotest limits of their own counties, and from all adjacent ones, to the distance of five miles from place of trial, and from term to term, without money or allowance by law to defray expenses, and yet compelled to incur them, in order that the miserable pittance heretofore paid them by a great State for that purpose—in order, forsooth, that this fund may be used for other and better purposes—I bitterly regret to realize that a Constitution which has been pronounced by the most eminent of statesmen as the best in the republic, and which I have always revered as such, is powerless to prevent it. I have never believed it, and though forced to realize it now, I cannot permit that construction to go unchallenged. I am of the opinion, yet, unshaken by argument and the ably expressed view of the majority, that this

particular service and expense cannot be devolved upon individual officers and witnesses; that it is a taking of their particular services, and of their property for expense, in violation of the Constitution.

An analysis of the Act under consideration shows that all fees and expenses of certain officers and witnesses—compelled to attend trials, incur expense, and render services for the State—are disallowed in the great majority of criminal cases, felonies, and misdemeanors, and before both Courts and Magistrates. In making this general statement, and before proceeding to a more specific analysis and discussion of the Act, it is essential to notice here two general propositions in the opinion of the majority. The first is that the Act does not compel the service or the incurring of expense on the part of officers and witnesses, and the second, that the Magistrate's relation to a criminal case is such that he is not an important factor, and that the denial of his fees, so far as they are denied, or the allowance thereof, so far as they are allowed, and without regard to the terms upon which they are allowed, can work no injustice to a defendant.

The first proposition results from assuming that this law is to be treated as a distinct and independent law, enacted alone and standing alone. The obvious answer is that it is but an addition or amendment to existing laws left intact, and which become parts of it if it stands. It can no more be valid if their existence is destroyed than it could be if

the Courts were destroyed, for there would be nothing left to effectuate its operation.    It is precisely, therefore, as if the Legislature had re-enacted all the existing provisions of the law relating to officers, witnesses, and Magistrates, except that covering fees, and then inserted this in lieu of all legislation on that subject.    Indeed, elsewhere in the opinion the majority so declares, for, as to the objection that this law is a direct repealing and amending statute and does not refer to the laws repealed or amended, it states that the Act is "a new and original law," and cites a number of cases on that point, showing that such a law but supersedes all others on the same subject inconsistent with it, and takes their place amid and as a part of the other statutes, thus, with them, making up the whole body of the law.

As to the second proposition concerning the Magistrate's inconsequential relation to criminal trials, the majority assumes this because it is only in submissions he acts finally, and when he binds over to Court, in that tribunal he has no voice.    The answer to this is equally obvious, and, I think, equally destructive.    The Magistrates get their primary fees only upon submissions, it is true, and if we assume that this will never be made an oppression to the poor and helpless by bringing about submissions through deception or duress, still it is ignored by the majority that the Magistrates are the preliminary triers of those bound over.    They do not bind over merely upon a charge, but, if there is no submis-

sion, hear the evidence and bind over or not, as they think proper. This affords the chance and the temptation for oppression. But passing this, also, with a bare notice, and coming to the proposition that they have "no voice" in the trial Court, I deny wholly that they are not factors, and affirm that they can—and the effect of this law is to- induce them to do so—make themselves most important factors in conviction in a large proportion of criminal cases, because they, assembled in County Court, select the men who compose the grand juries, which find all indictments and presentments, and the traverse juries, which try all misdemeanors, and which, as a rule, are tendered, along with others, in nearly all special venires ordered, from which the felony juries are made up.

Having disposed of these two points, I return to a specific analysis of the Act for more particular application, and to serve as a basis for such argument as I wish to make against its constitutionality— a clear understanding of it being necessary to proper appreciation of the objections on that ground. It is entitled "An Act to regulate and restrict the payment of costs and fees in criminal prosecutions," and has three sections. Taking them up in inverse order and beginning with the second—for the third contains nothing but a provision that the Act take immediate effect—we find in it a sweeping and general disallowance of fees, costs, and mileage to all witnesses for the State, in all cases, and without regard

to county of residence, where the witnesses reside within five miles of the place where attendance is required.

The first section declares that no fees or costs shall be allowed against the State or any county in favor of anyone (including here, of course, both witnesses and officers), except as thereinafter classified, and in the classification provides for payment of costs of prosecution in all cases of conviction, saving two exceptions—one already stated in the analysis of Section 2, denying costs to witnesses within five miles—and the other where defendant, on conviction, has given security for the cost, and it cannot be made out of him and his sureties on execution.

It provides, further, for payment of costs in eight felony cases—homicide, rape, robbery, burglary, arson, embezzlement, incest, and bigamy—where the prosecution has proceeded to a verdict, whatever the verdict may be, whether of conviction or acquittal, and whether there was or not a judgment pronounced upon it (this, of course, subject to exception of Sec. 2). It also provides for payment as heretofore of the compensation for boarding prisoners, expenses of "keeping and boarding juries," compensation of jurors, costs of transcripts in cases taken by appeal or writ of error to the Supreme Court, mileage and legal fees for removing or conveying criminals and prisoners from one county to another, or from one jail to another, and compensation and mileage of witnesses for the State required to attend as such

outside of their county, where they reside more than five miles from the place of attendance, and for compensation to State witnesses when confined in jail to secure their attendance.

Having analyzed this Act, and stated its effect in the order in which I wish to consider it, I return to the consideration of constitutional objections to its validity. Though quoted by the majority, I deem it necessary to restate, in part, in connection with the views I desire to express, the constitutional pro-visions assumed to be violated. The Bill of Rights (Art 1., Sec. 21, of the Constitution) declares "that no man's particular services shall be demanded, or property taken or applied to public use, without the consent of his representatives, or just compensation being made therefor." The "consent of his represent-atives" here can only mean the consent of anyone authorized to represent him in yielding such service or property to any demand or taking which may, by law, be made. It cannot mean, I think, as may possibly be implied from a statement in this con-nection in the majority opinion (though nothing was predicated of it), the consent of his "legislative" representatives, because the section is itself a limi-tation on legislative power. If it had been intended to mean unless "demanded or taken by the Legisla-ture," it would have been useless and meaningless, and, in lieu of it, the provision would have been "shall not be demanded or taken unless the Legislature demands and takes it." But it is useless to argue

Henley v. State.

this proposition. If any one question has been set-
tled, it is that the Legislature cannot demand and
take particular services or property (of any kind) for
public use, without consent or just compensation, and
cannot take for private use at all. See cases collected
in note to this section in Shannon's Code, page 48.
There is as little difficulty in determining the meaning
of the conjunction "or," used in the phrase "con-
sent of his representatives or just compensation being
made therefor." It is the disjunctive, to indicate
that the services may be demanded free or the prop-
erty taken without charge if the person to be affected
by it, or any representative authorized to act for
him, consent, but that if he does not consent, or
refuses to consent, they may be demanded or taken
upon just compensation being made therefor. Prop-
erly elaborated and changed to an affirmative, the
section would read: "The State may, by Act of the
Legislature, demand for public use the particular
service of any person free, or take and apply his
property to public use, without compensation, if he,
or any person representing him authorized to do so,
consent, and it may so demand such services, and
take and apply his property to public use, without
consent or against refusal of consent, upon payment
of just compensation. In this view it would seem
plain that the services involved in attending Court,
performing duties required, and giving evidence,
could not be demanded by the State without com-
pensation, or, to state it more accurately, denying

14 P—46

compensation by express provision of law. This un-
der the particular service clause.

It would also seem equally clear that in addition
to this objectionable demand of time and service, the
money which the officers and witnesses must pay for
fare, if transported by another, for pikeage and fer-
riage, if they ride or walk, and for expense of
boarding themselves during the service demanded,
which is their property, could not be taken and ap-
plied to public use without compensation. We need
not stop here to consider the fact that time and
labor are property. This is too well settled for
controversy. But if they were not, the constitutional
clause quoted includes by apt words (for no service
can be performed without time), and protects them
equally and alike against taking by the State without
compensation.

It would appear, therefore, that by the unqual-
ified language used as to taking property for public
use, and by the natural construction of the phrase,
"particular services," as applied to the services which
may be exacted of individuals, that both are pro-
tected by the plain terms of this provision. But, it
is said, there is something in the meaning of the
word "particular," used in connection with "serv-
ices," which must be held to disentitle these citizens
suing in this case to this protection, because the
"services" they rendered are not the "particular"
services intended to be protected; that the services
of officers and witnesses, "such as may be required

of all citizens or officials by general or valid special laws," are "ordinary," and not "particular," and may be taken without compensation. This is illustrated by the case of a physician, who, it is said, may be compelled to testify without compensation, but cannot be compelled to examine into the matter inquired about, and then testify; and, indeed, just such a case in Indiana actually arose, and was so decided, but, in my judgment, speaking with due respect for that Court, it frittered away a great constitutional principle over a controversy about nothing, for the Court finally held, in effect, that the clause did not cover services which might be demanded under the police or sovereign power of the State, and that witnesses' services were such because they were "such as any individual was bound to render when called upon for the public welfare."

If their theory be true, their conclusion was erroneous, because, under that power, any services may be demanded, and any property taken or destroyed, without compensation.

As justly said by counsel for defendants, "Strange as it may appear to some, there is a power of sovereignty not limited by, and superior to, any written Constitution. It is the power of State preservation. It, so far, has found expression only in the assertion and exercise of those powers known as war powers, police powers, taxation, and eminent domain." Randolph on Em. Dom., Secs. 8, 9, 23, 24; Prentice, Police Power, Sec. 6; Mills on Em. Dom. (2d

Ed.), Sec. 9; *Miller* v. *Norton*, 152 Mass., 540; Tiedeman on ˌPolice Power, Sec. 42; *Markham* v. *Brown*, 37 Ga., 277. These are the great reserved powers of the State.    53 Am. St. Rep., 564.

Not uncontrollable or despotic, but practically controlled alone by the wisdom and justice of the Judges, "subject to the discretionary coercion of Courts" (1st Ventris, 66), to the judicial determination of its appropriate limits. *People* v. *Budd*, 117 N. Y., 15. Like the attempt to define "due process of law," it comes at last to the gradual process of judicial inclusion and exclusion. *Davidson* v. *New Orleans*, 96 U. S., 97–104.

This is a well-recognized power, and nowhere more fully than in this State (14 Lea, 626), but it is a distinction and not an exception to the constitutional inhibition we are considering. It is not a question of what services, "particular" or otherwise, may be taken under these sovereign powers, outside and above the Constitution, it is a question of what the purpose of the taking is. So, in the case cited, (*Theilan* v. *Porter*, 14 Lea, 626), it is said: "But this inhibition has no application as a limitation of the exercise of those police powers which are necessary to the safety and tranquillity of every well-ordered community, nor of that general power over private property, which is necessary for the orderly existence of all governments."

This was a case of the destruction of private property without compensation, because it was ˌun-

healthy and a nuisance, and the State's right to do it, or permit it to be done by a municipality, was upheld, and justified upon authority. It was rested upon the principle announced by Chief Justice Shaw, and his opinion quoted to this effect: "Every holder of property, however absolute his title, holds it under the implied liability that his use of it shall not be injurious to others, nor to the rights of the community. If it be hurtful he is restrained, not because the public makes any use of it, or takes any benefit or profit from it, but because his own use of it would be a noxious use."

It cannot be doubted that in such a case physicians could have been compelled to examine and furnish evidence of its condition for the public good. So, I think, it clearly appears that the Indiana Court, in holding that such services could not be taken because "particular" or "extraordinary," misconceived and misapplied the rule relating to sovereign power. That Court assented to the taking of the witness service ("ordinary service") under the rule suggested, but denied its application to the very act to which, as to all others, it did apply—to the taking of extraordinary or special service. With such a misconception, I respectfully insist they misapplied the rule in the leading case cited by the majority— *Israel* v. *State*, 8 Ind., 467. There it was held directly; but in holding it, the Court stated the rule regarding sovereign power, and justified their decision in this language: "It is as much the duty and

interest of every citizen to aid in prosecuting a crime as it is to aid in subduing any domestic or foreign enemy, and it is equally the interest and duty of every citizen to aid in furnishing to all, high and low, rich and poor, every facility for a fair and impartial trial when accused, for no one is exempt from liability to accusation and trial. Those are matters of general interest and public concern, are vital, indeed, to the very existence of free government, and render the services of witnesses on such occasions matters of general public interest, and not 'particular,' in the sense of the Constitution." The other Indiana cases cited followed this and were based upon it.

The Oregon Court, in the case cited by the majority (*Daly* v. *Multonoma County*, 14 Ore., 20), in a brief opinion simply adopted the view of the Indiana Court, and in the exact language of its expression, thus practically making but one judicial exposition of the law and this, demonstrably, if not confessedly, upon the application of a principle wholly outside of the constitutional clause under consideration, and not at all dependent upon its construction.

These precedents, I respectfully insist, therefore, go for nothing. There are no others. The question was not involved in the Tennessee case cited (*Neely* v. *State*, 4 Bax., 174), which uses somewhat the same language, for there the point in judgment was whether the Legislature could pass a constitutional law taxing the losing party with jury fees. It

was held it could not. What was said outside of this was pure dictum; was not matter involved, argued, or considered, and is entitled to no weight as authority.

The other Tennessee cases were not in point. *Washington* v. *The Mayor*, 1 Swan, 180, was a case involving the police power of the State, and cases in 3 Heis. and 5 Bax. were *sui generis*, to which no law in particular was applied. They were cases holding that a lawyer might be required to defend a prisoner or act as guardian *ad litem* for a minor without compensation, and put upon the ground that "when a lawyer receives a license he takes it burdened with these honorary obligations." It was expressly held that the constitutional clause we are considering had no application, and it was not pretended that the service was demanded under the sovereign power. It seems to have been assumed to be an obligation of honor and duty resting on him as an officer of the Court to obey its orders to defend the helpless. The majority, putting it this way say, "As Sheriffs and Clerks are officers of the Court, so may they be required to render services, and so do they take their offices (as the lawyer takes his license) burdened with similar conditions and requirements."

This view is erroneous in several respects. First, they are not required by this law to render similar services; they are not to defend a few of the helpless, but to aid in the prosecution of nearly all

criminals without compensation. It cannot be doubted that lawyers could not be required to perform such services without compensation.

Second, they are not officers of the Court in the sense that lawyers are. They do serve before Courts, it is true; they are officers, and, in a sense, are officers of the Court, but they are constitutionally elected officers of the counties in which they serve, and are given by law and by constitutional requirement, fees of office, for when the election of these officers was provided for by the Constitution, without fixing salaries, it was implied that they were to hold them substantially as they had always been, and to render service in them with their general functions and the material, if not particular, amounts of compensation unimpaired.

Legislative Acts are void which attempt to take from constitutional officers the functions or the substantial emoluments of office. *State, ex rel.,* v. *Brunst,* 26 Wis., 412 (7 Am. Rep., 81); *King* v. *Hunter,* 65 N. C., 603 (6 Am. Rep., 754); *Pope* v. *Phifer,* 3 Heis., 682; *Warner* v. *The People,* 3 Denio, 272 (43 Am. Dec., 740).

I regret that the length to which this opinion must be extended forbids quotation of these cases. They should be read in connection with it, to appreciate the full force and merit of the proposition they are cited to sustain.

Compensation to these officers was always a matter of legal provision and of right. The lawyer's com-

pensation was never a matter of legal provision, and only in later years a matter of right. He once took his license burdened with the "honorary obligation" of rendering all service free. It is no great deprivation that his present right and custom to charge for his services should remain yet burdened by the obligation to serve the helpless free when ordered to do so by the Courts. But if the case was authority for depriving Clerks and Sheriffs of their fees, and taking their services without compensation, it avails nothing as an authority in this case. If the decision needs the support of this authority it must fall, because, confessedly, Justices of the Peace and witnesses are not officers of the Court, and the principle could not sustain the law construed, because that law deprives these also of compensation. Nor do the cases holding that citizens may be compelled to serve in the militia or work on public roads without compensation help the decision. The right to the first service without compensation is clearly a right of sovereignty under the war power. If the citizen can be compelled by the State to serve in war, he may be required to prepare for such service in peace, and the right to the second was probably asserted on the same principle. When first this service was required the country was a wilderness, and its inhabitants, without roads, were beset by foes, native and foreign. The object of opening and guarding a great highway through this territory (now State), from Clinch Mountain to Nash-

ville, was made the subject of legislation by North Carolina in 1786, and a battalion organized for this purpose among others. Acts North Carolina, 1786, Ch. 1, § 15.* In this and like manner originated the work of building, guarding, and working roads when the country was new. It was freely accepted as proper then. The system, with modifications, continued and became an unquestioned one. The emergent, sovereign necessity long since ceased, but the system was established and continues without objection. The necessity having passed, it is no longer justifiable, perhaps, but it is recognized and continued. Properly, now, it is supported by no well-recognized principle. It is certainly not to be extended or used as a precedent for innovations upon the Constitution, or infractions of settled limitations on legislative power.

After all, the validity of the law involved in the case before us must depend on whether the services demanded are such as may be demanded under any sovereign power suggested, or whether they are services which cannot be demanded for public use under the Constitution. The majority treats the word particular as "peculiar," or "extraordinary." I have shown, I think, that its construction is wholly immaterial, but I most earnestly insist that this construction of this word as employed in the Constitution is erroneous. Its primary meaning in single

*It is worth noting that this statute was entitled "An Act for the protection of Davidson County," and that Maj. Nathaniel Evans, great grandfather of the author of this opinion, on the mother's side, was commander of this battalion by virtue of an election to that position by the General Assembly of North Carolina.--REPORTER

Henley v. State.

words, as defined by Mr. Webster, is "separate," "sole," "single," "individual," "specific." Its secondary signification of "peculiar," adopted by the majority, is not "peculiar" in the sense of "extraordinary," implied by them as illustrated by reference to ordinary and extraordinary services of physician. Mr. Webster does, indeed, give this as one of the secondary meanings, but in this connection: "Of or pertaining to a single person, class, or thing; belonging to one only; not general, not common; hence personal, peculiar, singular. 'Thine own particular wrongs.'"

In this sense "peculiar" is made to mean "one's own," and this, too, is the primary meaning of "peculiar," as he elsewhere defines this word. But why shall we look for secondary meanings at all, and why is it necessary to give such secondary meaning another not allowable in its own primary definition, to destroy the application of this beneficent constitutional provision? It must mean, and in my opinion it can mean nothing, in the place employed, but individual, specific, and separate service, in contradistinction to that general service which might be required of all citizens under the sovereign power— say, in case of insurrection or invasion. The limit must be placed, the line of distinction drawn, somewhere. If not here, where can it be? If the view of the majority be correct—that it means any service to the State in the way of witnesses, jurors, etc.— then it extends to all service the State requires, in-

cluding the highest as well as subordinate official service, and every citizen may be required to serve the State in every capacity without compensation, and not only to serve the State, but to bear his own expenses while doing so.

The fundamental error in the majority opinion is in classifying the service of officials and witnesses as "sovereign" instead of "government service," as service required in emergent conditions of the government's life, and, therefore, belonging to the sovereign, instead of service performed in the usual administration of public affairs, and therefore to be performed only under the Constitution, and only to be required under the Constitution and upon its terms, and not under the reserved powers. If this be not true, what is the meaning of the phrase "applied to public use," in the provision declaring that "particular services shall not be demanded, or property taken, or 'applied to public use,'" without compensation? It was not to guard against its application to private use. It cannot be taken for private use at all. It was to provide against its taking for public use, and it does so in the most express terms possible. To give the phrase any meaning, it must be held to prevent the application of individual services or property to the ordinary service of the government, and such, unquestionably, is its prosecution of criminals—its administration of law. These, indeed, are the ordinary purposes for which government is organized. They are public,

important, necessary purposes it is true, but, at last, they are but the usual and ordinary purposes of government. They are not emergent, they are not alike, they do not belong to the class relating to war, famine, pestilence, and other extraordinary conditions, when the necessity of the government, like it is said of necessity in the abstract, "knows no law."

It is true it is a public purpose to convict a criminal, but it is equally true that it is a public purpose to keep a criminal in confinement as a punishment for crime, and to protect the community. If the services of the citizen can be taken to convict, they may be taken to guard and keep the prisoner; and, indeed, they may be taken for all public purposes, and the constitutional provision made a mockery. The only rule that can save it is that which holds it applicable to all usual ordinary government service, and inapplicable when those extraordinary emergencies arise which call for the resistless power of sovereignty over and above any law; when, as in case of troubles like that of war, all laws are silent.

But, again, if there was any controversy as to the "services" which can be taken because of the use of the qualifying word, there can be none as to the "property." The language of the Constitution in reference to it is not "particular" property, but "property;" any property in reference to the taking of which this inhibition speaks. So the cases on the construction of the word "particular" could

not support the opinion, because this law takes not only the services, but the money of officers and witnesses required to pay their traveling and boarding expenses while attending Court and rendering the services taken, whether they be "particular," in the sense used in the majority opinion, or not. If the Act, therefore, was not invalid because of taking the services, it would be on account of taking the property, for, to be valid at all, it must be valid against both inhibitions.

So far, I have been considering this constitutional provision in disconnection from all others, but if both propositions maintained here are erroneous, and such services and property as is involved in this case might be taken by a proper law under this clause of the Constitution or despite its prohibition if it stood alone, then I insist that they could not be taken by this Act, because the taking and application thereof on its terms violate other provisions of the Constitution preserving and guaranteeing to a defendant the right of inviolate trial by an impartial jury.

In other words, if the State can demand and take such services and property as it has done here absolutely and without compensation, and apply them to the public use, without more—as, for illustration, if it can require all officers and witnesses to serve the State in such capacities and pay their own expenses without compensation in any or all cases—it cannot do it on the terms of this law, which offers

a compensation for such services and property only to accomplish, and when it accomplishes, a conviction, and thus incumber and embarrass the right of trial by jury with conditions which, in their practical operation, impair or violate that right or obstruct its free and full enjoyment.

This Court, construing another constitutional provision involved in this case, and to be considered further on, said: "Another essential to the validity of a legislative Act—of classification—whether it be made under Art. XI., Sec. 8, or under Art. I., Sec. 8, is that it must not violate any other provision of the Constitution, whether such provision be expressed or implied." *Stratton* v. *Morris*, 5 Pickle, 535. That is, that though an Act might be valid, *per se*, if authorized by one provision, it would not be valid, though so authorized, if not framed to be unobjectionable under every other.

The only answer to all this which we find in the view of the majority, is that there is no provision in the Constitution for impartial officers and impartial witnesses. Granted, but this is not the question for determination. It is freely conceded that there may always exist partiality in both, as a natural human sentiment, but what I am combating is the constitutional right of the Legislature to make them so by terms of law; to provide for it, in the face of the constitutional provision for an impartial trial. Heretofore, when any special reason for partiality appeared in an officer, it was held that

the constitutional provisions followed in legislative Acts were ample to exclude him from acting, and in the Clapp case it was held, where the Sheriff was interested in the result, as an accident, the defendant's right to a fair and impartial trial was violated, and there was, in the meaning and spirit of these provisions of the Constitution, abundant power to declare it and protect the defendant. Now, when made interested and partial by terms of law, we hold that defendant is not entitled to protection. The same argument applies in respect to witnesses. I am not contending that the Constitution or any former laws made impartial witnesses. The law never did create or require impartial witnesses. But what I am contending is that the Constitution does not permit, in fairness and justice to the citizen, that the Legislature shall make them partial, by terms of law, by bidding for the service of conviction. This point has been expressly decided. In the case already referred to, in which it was said, but not decided, that a juror could be compelled to serve without compensation, it was directly held that this could not be done upon conditions which impaired the right to such a trial.

I quote from that case: "The Bill of Rights (Art. I. of the Constitution) guarantees to all citizens the right of trial by jury unimpaired and without violation. This manifestly means that the right shall never be embarrassed or incumbered with conditions which, in their practical operation, may

impair or violate the free and full enjoyment of the right." *Neeley* v. *State*, 4 Bax., 184.

This was on the point in judgment, and the only one for which the case is authority. *Railroad Co.* v. *County Court*, 1 Sneed, 639, 695.

The guaranty to the citizen that the right of jury trial shall remain inviolate and that he has the right to be heard in his case by himself and counsel before an impartial jury, would be a hollow mockery, if it did not by unavoidable implication express that he was guaranteed such a hearing and such an inviolate trial by such a jury as was itself, in its formation, in all the elements and in all the conditions of its relation to results, fair and impartial, and so I deny that the expression in the Clapp case (which is but a reiteration of similar expressions scattered through all preceding opinions), that a fair and impartial trial is guaranteed to a defendant under the Constitution and laws (meaning laws whose enactment was compelled by its provisions), is a misuse of terms or expresses more strongly than the Constitution itself does this precise proposition.

It is but the formulation in other words of exactly the same meaning, of that guaranty of a fair and impartial trial which the Constitution makes, and I most earnestly dissent from any interpretation or construction which denies, for any purpose of argument or decision, that our Constitution does not expressly, and without the aid of any "law" or

14 p—47

"laws," secure such primal and inestimable right of freemen in their litigations with the State or between each other.

The right of a fair and impartial trial, said this Court in the Neely case already quoted, is one which can "never be embarrassed or incumbered with conditions which in their practical operation may impair or violate the free and full enjoyment of it." In that case (and I am pleased to select it because it is the principal Tennessee case on which the majority relies), it was held that the taxation of jury costs against the losing party violated the citizen's right to a fair and impartial trial.

What have we here, under terms of the law we are considering? The State arranges the machinery for the trial of a defendant. It gets in readiness to secure him that fair and impartial trial, how? First, by directing the Sheriff (who has arrested defendant and lodged him in prison or taken his bond for appearance, summoned the witnesses, and thus accumulated costs in this officer's favor) to summon this (to be) impartial jury. Second, by devolving upon the Clerk (who has issued the warrant and the subpœnas and entered essential orders relating to the case, whereby costs have accumulated in his favor) the duty of making provision for drawing this impartial jury, and making all the entries in respect thereto down to final judgment. Third, by turning this jury over to an officer, to be attended from day to day until verdict, who may also have costs de-

pendent upon the result of the trial. Fourth, by bringing all State witnesses before the Court from every quarter of the county in which the trial is had, and five miles beyond, to give evidence, and then, "by terms of law," assuring them all that for their services in the case, in conviction, they shall be specially compensated. If they convict, they shall be paid; if they acquit, they shall not only not be paid, but shall be denied expenses! Thus, by a State reward, is leagued against a defendant the men who summon and guard his jury, who provide for its drawing, and keep the record of his trial, and who give evidence against him, and whose combined fees and expenses in particular cases may, and often do, amount to hundreds and sometimes thousands of dollars. The State says: "I summon you to trial; I invite you to a fair and impartial trial. Behold the Sheriff who arrested and committed you, who summoned the witnesses and the panel from which you are to select your triers, the final judges on whose decision hangs your liberty or life—the Clerk and the officers of Court and the witnesses! I have promised them all payment only on condition that they convict you. Take your seat. If you think against the facts of the case, against the usual human bias in disfavor of a man or woman charged with a criminal offense, in the distress ofttimes of poverty and friendlessness, the embarrassment and odium of imprisonment, you can defeat this combination of selfish interest and law-created league against you,

proceed to do it, and attest with constitutional reverence that, considering your desperate chances, you have had a fair trial—as fair, at least, as that of running the gantlet.''

In this connection I note that the majority lays special stress in favor of the fairness of the trial under the present law, because the Sheriff's fee for summoning the special panel is not taxed to the defendant, but is paid out of the ''treasury.'' It is true, that under the Act of 1882, such cost is taxed to the county. Whether under the general provisions of the Act under consideration, providing that in the majority of criminal cases no costs shall be taxed to the State or county, and only as a result of verdict of conviction in others, this law of 1882 is repealed, it is not necessary to determine here. Let it be granted that it is not affected by the Act we are construing, and that this part of the Sheriff's cost is not dependent upon the result of the prosecution; this is the smallest item in his account in such cases. The Act of 1882 gives only five cents for the summoning of each juror ordered in special venire, while for all other services in the case a much larger charge is provided for, and, expressly, the compensation for these services is so dependent. If the law would be objectionable with that in it, as seems to be implied from the reference to it in the majority opinion, it is impossible to see why it is not so with the more largely compensated service in the case so dependent.

The same suggestion is made as to the officer attending the jury. The majority assumes this is paid as heretofore because the expenses of "keeping and boarding" juries is provided for in the Act. I think it clear that this expression has reference only to payment of jury expenses proper—that is, if they are but supplied with food, their boarding expenses are paid; if they are "kept" and furnished lodging, this expense of "keeping," too, is paid, and hence the entire expense of "keeping and boarding" is provided for.

This is demonstrated by an examination of former statutes on subject of jury board. The first used the term "boarding and finding." Code, § 4032. In the others the word "keeping" is used as the term for "boarding." Code (M. & V.), § 6454. This was the Act of 1859-60, Ch. 6, Sec. 2, p. 4, and was amended by an Act which, in its caption, used only the term "boarding," and in the body, as expressing it, the word "keeping." In succeeding section the bill of person authorized to receive it, was to be for "boarding." Code (S.), §§ 7607, 7608. Acts Ex. Ses., 1885, p. 76.

The officer attending them never was paid under any fee bill head of "keeping" a jury, which he in no sense does, unless he should happen to be an innkeeper or temporarily act as such. His compensation has been paid heretofore for attending and waiting on the jury under the fee bill in favor of officers for "attendance on Court" (Code, § 4564,

Subsec. 26; Shannon, § 6402, Subsec. 25), and "for attending on grand jury and waiting on Court." Code, §§ 4571, 4572, Subsec. 9 (Shannon, §§ 6409, 6410, Subsec. 8).

It is under these sections the compensation is provided for, and it is these and these only which fix the amount. There is no distinct fee for waiting on a "trial jury" in these terms, but such fee has been paid, by accepted construction, because, in such service, the officer is, in a proper sense, in "attendance on" and "waiting on Court." These are the only statutes governing this matter. The item of cost is in the regular fee bill. No reason is perceived why this fee, paid heretofore by the public, is not now eliminated by the general implied repeal of this statute, under which all charges, except those provided for in the Act, are swept away.

But, again, it is to be observed that the officer may be the Sheriff himself, or a deputy who has other costs in the case, or a Constable who may have earned preliminary costs in it before a Justice, and whether this special cost of attending the jury be dependent upon the result or not, he may be otherwise more interested in other costs. So that to save this point is not to help the opinion. If it needed to be saved, the remaining costs leaves a remaining interest which would vitiate equally without this as with it. Here, however, we are told that if any such officer be interested he may be objected to, as was done in the case of *Clapp* v. *State*.

Henley *v.* State.

This will not answer to help the law, for it must be remembered that the Sheriff's interest in that case was held to be a special one of fact, which the law would not tolerate in an officer who might influence a jury.    Under the construction given to the Act here involved, it is held that the interest it vests in officers to fees upon conviction will not affect them, or be objectionable by defendant, and this holding is a necessity to sustain the law, because these officers are interested in all cases, and if, upon defendant's objection, they could be disallowed to serve in the cases, their whole service would be rejected.    The very Act, therefore, which is upheld because the service can be unobjectionably performed, would be made to mean that they were objectionable, and should not be performed if objected to.    I cannot, therefore, understand what meaning, under this law, is to be given to the suggestion in the opinion "that if any officer is disqualified by interest, his place may be supplied, as was indicated in the Clapp case."    It cannot mean that the allowance of cost, in case of conviction, shall disqualify the officer, for the whole opinion is devoted to combating the idea that there is anything wrong or illegal in this.    As applied, therefore, in connection with the suggestion of the majority, that "it will thus be seen that the Act jealously guards the prisoner's right to a fair and impartial jury," I must confess my inability to see how any exception, on the grounds implied, can be

made, or, if made, how it could be sustained without abrogation of the law.

I therefore most earnestly deny that it can thus, or otherwise, "be seen that the Act jealously guards the prisoner's right to a fair and impartial jury."

The various cost statutes to which the majority refers, which are supposed to help in establishing the validity of this law, I need not discuss. It is sufficient to say that no other statute, valid or invalid, just or unjust to the citizen, can afford any aid to this Act on the constitutional questions involved. Nor need I discuss the State's abstract right to disallow taxation of costs against itself or its counties—its various divisions of sovereignty— where that power is exercised, or its right of denial of suit to its wronged citizens.

It can be readily admitted that the last three propositions, in the abstract, are true, and then as readily proved that it cannot do so, if, in the same Act or by pre-existing Act, it provides for demanding the particular services or taking the property of the citizen for public use without compensation, if that compensation depends upon taxation of costs, or right of suit against the State, in which event, the refusal to allow such taxation and the denial of suit would be admitted by the Courts, but the right to demand the service or take the property would be denied—as, for instance, if the State should be without a capitol, and provide by law. for suit of condemnation to take from an owner such

property as it preferred for that purpose, without providing for payment, and, in the same Act or by pre-existing Act, declare that, in such suit, no cost should be taxed to the State, and no suit (or remedy) given to the owner for obtaining · compensation, the right not to be taxed with cost without its consent would be conceded, the right to deny its liability to suit would be confessed, but the right to take property and force the owner to incur costs in such suit would be denied, because of the constitutional provision ´ we have been considering.

But these propositions, I think, are not relevant. I am presenting specific objections to the validity of this law. It is no more valid if other statutes are invalid, than invalid if they are valid. Each must stand on its constitutional merit. Some of them, perhaps, have as little as this, but want of time and space to me, even more than irrelevancy in them, forbid extending this opinion for their analysis and discussion.

I wish to present one more constitutional objection to this Act, and that is that it is class legislation, arbitrarily capricious, and therefore void.

Art. I., Sec. 8, of the Constitution declares that "no man shall be taken or imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed or exiled, or in any manner destroyed or deprived of his life, liberty, or property, but by the judgment of his peers or the law of the land." Under this provision, it has been held that an Act is not "the

law of the land" when the classification upon which it is based is unnatural, arbitrary, and capricious. *Stratton* v. *Morris*, 5 Pickle, 541.

"Whether a statute be public or private, general or special, in form, if it attempts to create distinctions and classifications between the citizens of this State, the basis of such classifications must be natural and not arbitrary. If the classification under this section is made for the purpose of subjecting a class to the burden of some special disability, duty, or obligation, there must be some good and valid reason why that particular class should alone be subject to the burden." *Ib.*

Distinctions in these respects must not only be natural and not arbitrary, but must rest upon some reason upon which they can be defended—some sound legal reason. Cooley's Const. Limitations, p. 390; *Dugger* v. *Insurance Co.*, 11 Pickle, 258.

Elsewhere I have shown that the general object of the bill was to take the principal expense and burden of criminal prosecution off of the whole body of the State and devolve it upon a few, and in this sense the law, in its general scope and purpose, is obnoxious to this provision of the Constitution. But, analyzing it more particularly, its special classifications are unnatural, arbitrarily capricious, and, in my judgment, absolutely indefensible. I quote here the admirable analysis of defendant's counsel on this point:

"When the Act passed, February 3, 1897, the law was, and long had been, that the witnesses for the

Henley v. State.

State should be paid in all cases, regardless of the disposition which might be made of them.

"Such being the law, this Act, discriminating among persons who belong to the class called witnesses, as follows, was passed: First, the witnesses in eight named kinds of felonies are paid when the case proceeds to a verdict, and, consequently, the witnesses in such cases which do not proceed to a verdict are not paid. It often happens that after repeated continuances, mistrials, and reversals, a felony case (of one of these eight kinds) is nollied, or the case terminated by the death of the accused. The witnesses have attended alike in all cases. In no case do they control it.

"In one case there was a verdict; in the other the case was nollied; in the third the defendant died. Can anyone give even the pretense of a reason why the witnesses should be paid in one case and not in the others? An apt illustration exists in the following case: A murder is committed in a remote district. Henry and James are suspected and indicted. They sever. After repeated continuances and mistrials, Henry is acquitted. After repeated continuances and mistrials, James dies. The witnesses are from the same neighborhood, pass through the same toll gates, cross the same ferries, or come on the same train, and alike leave their plows standing in the field. The witnesses in Henry's case are paid. The witnesses in James' case are not. As the witnesses ride home, discussing the situation, what ar-

gument can the witnesses in Henry's case, with the money in their pockets, make to the witnesses in James' case, who returned empty-handed, which will satisfy them with the justice of the discrimination?

"Again: Why should the witnesses in a manslaughter case be paid if the case proceeds to a verdict, and not be paid in a case of assault with intent to commit murder, which has proceeded to a verdict?

"Why in case of rape, but not in cases of attempt to rape? or in bigamy, but not an attempt to poison?

"Why in embezzlement, but not in fraudulent breaches of trust?

"Why should they not be paid when the case proceeds to a verdict in railroad wrecking, official bribetaking, corrupting jurors, suborning witnesses, horsestealing, and masked marauding?

"Witnesses living more than five miles distant, going to another county, are paid, while those living within five miles are not. Conceding, for argument, that the discrimination as to mileage can be defended, that as to witness fees cannot? A day at Court is a day of time, whether the witness came five miles or ten.

"The truth is that, whether the nature of the crime or its effects upon the public or the degree of punishment, be considered, the classification is arbitrary, indefensible, and absurd. But, if it be possible, a more indefensible classification yet remains

to be noticed. The witnesses for the State in eight named felonies are to be paid when the case proceeds to a verdict, but in fifty other felonies, and many misdemeanors, they cannot be paid, even though the case has proceeded to a verdict, unless it be one of conviction.

"The inconvenience to the witness and the loss of time, and the fares and tolls, are not determined by the legal nature of the case, but by the circumstances of the witnesses. They are the same to him in all cases. Moreover, he cannot absolutely control, however much, under this Act, he may influence the verdict. Consequently, a statute which discriminates between witnesses in respect of their compensation in criminal cases according to the jury's verdict, is cruel, arbitrary, and indefensible. It is indefensible and arbitrary because it unreasonably discriminates between witnesses. It is cruel because it stabs the accused."

I need add nothing, if, indeed, anything can be added, to this view of the Act on this question. What is presented in it is, to my mind, absolutely conclusive. Though I have extended this opinion to great length, and am conscious that I will· be less heard for much speaking, I am also aware, and suggest in deprecation of adverse judgment on this account, that much has been omitted which could, and perhaps ought to, have been said, and particularly as the clear, able, and thoroughly matured opinion of the majority upholding the validity of this Act

has presented all that can be said in its support, fully suggesting the objections to it, and evading none.

The question, too, is a great one, and worthy of profoundest consideration. These, and my earnest conviction that the law is in violation of some of the dearest rights which citizens of Tennessee have been permitted to enjoy for a hundred years, are my excuse—if not justification—for the length and the earnestness of this dissent. But I am aware that strength of conviction is often quite inconclusive of accuracy of judgment, and that this is more often true when the conviction is not in accord with that of any other member of the Court, all of whom are as earnest, as fixed in opinion, and certainly as able to exercise as good, if not better, judgment, than my own. With the construction given, however, in favor of the Act, I desire to record my dissent as fully and as strongly as I am able to express it.